Filed 12/30/25  P. v. Ross CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>ALEX ROSS,<br><br>    Defendant and Appellant. | A172545<br><br>(Solano County<br>Super. Ct. No. VC37766) |

In 1996, Alex Ross was found guilty of the second degree murder of eight-year-old Emily Dion and attempted voluntary manslaughter of her mother, Jennifer Dion.  His sentence included a one-year prior prison term enhancement that was subsequently invalidated by Penal Code section 1172.75.  He now appeals from the judgment entered after his resentencing pursuant to that statute.

Ross contends the trial court erred in imposing an upper term for the attempted voluntary manslaughter and imposing unauthorized terms on two gun enhancements.  He further contends the record does not support the trial court's finding that he currently presents a danger to public safety and does not reflect that the court properly considered a number of issues, including Ross's requests for dismissal of the gun enhancements, his motion to strike a prior strike and his record of rehabilitation.  We conclude the sentence must

1

be vacated because the court imposed unauthorized sentences on the two gun enhancements, thus requiring a remand for full resentencing.

## BACKGROUND

### I.

### *Factual Background*[1]

Jennifer Dion testified that about 3 a.m. on May 24, 1994, as she and her three children were sleeping in the front bedroom of their home in Vallejo, Emily woke Dion and said someone was hiding under the bed. Dion turned on the lights and Ross, whom Dion knew, crawled out from under the bed. Dion saw a handgun tucked into the back of Ross's pants. She asked why he was there and he " 'kind of sat there and looked at [her] really strange.' " He refused her repeated requests for him to leave. She thought he was drunk and might be on drugs, but he appeared to know what was going on around him and responded appropriately in their conversation.

Since Ross would not leave, Dion thought it would be best to try to keep him calm and she tried to engage him in small talk. He eventually told her to turn off the light and remove her robe, and she did. He removed his clothes, told her to be quiet, pushed her down on the couch and forced her to engage in two acts of sexual intercourse over a 30-minute period.

As Dion started to get up, saying she had to go to the bathroom, Ross grabbed her neck and began choking her. She screamed and tried to fight him off. Emily came into the room and said, " 'Don't hurt my mommy.' " Dion told Emily to run, and Emily ran out the front door. As Dion tried to escape through a window, Ross shot her in the back of the neck. Dion turned

---

[1] Pursuant to Ross's unopposed request, we have taken judicial notice of our opinion in the appeal from his 1996 conviction. (*People v. Ross* (Apr. 24, 1998, A076077) [nonpub. opn.].) We summarize the facts as stated in that opinion.

and watched Ross get dressed.  As he headed out the door, he turned and shot her a second time in the neck.  She dropped to the floor and pretended to be dead.

Ross ran out the front door, four-year-old Nicolas got up and closed it, and the door locked automatically.  Dion heard two shots fired outside, then heard someone trying to open the front door.  A moment later, she saw Ross outside, pointing the gun through the living room window she had opened when she tried to escape.  She was not sure if he fired another shot.  She heard him run along the side of the house and out her back gate.

When Ross was gone, Dion walked outside and across the street and found Emily dead on the sidewalk.  An autopsy showed she had been killed by a contact gunshot wound to her face that severed her spinal cord.

Ross testified.  He did not dispute killing Emily and seriously wounding Dion but disputed Dion's version of the events leading up to the shooting.  He testified that he drank several 40-ounce bottles of malt liquor and smoked some marijuana that evening, then about midnight he consumed more malt liquor and gin, and smoked crack cocaine in his garage.  He was depressed over failure to get a job and recently had started experiencing suicidal feelings.  He became paranoid and thought someone was outside waiting to shoot him.

Ross wandered the streets, armed with his handgun, trying to evade his imaginary pursuers.  Passing Dion's home, he saw a light on inside.  He knew Dion as a supplier of speed or methamphetamine, had purchased drugs from her in the past, and on several occasions had used drugs and had sex with her.

Ross knocked on Dion's door, explained that someone was after him, and she let him in.  He was feeling intoxicated and paranoid.  They made

3

small talk and tried to have consensual intercourse, but he was unable to maintain an erection. As he lay on the couch, he felt " 'dizzy and the walls was spinning.' " He suddenly felt someone grabbing him, then heard a gun go off. He thought his imaginary pursuers had followed and shot him, and he felt an intense wave of fear. He had no memory of shooting Dion or Emily and denied breaking into their home or raping Dion. He denied that the shooting was premeditated or intentional.

Several family members and friends described Ross's lengthy history of drug and alcohol abuse, including that he sometimes became paranoid when under the influence of alcohol and cocaine. Neurologist Arthur Kowell testified, based on his examination and testing of Ross and review of the police records, that at the time of the shooting Ross was in a state of acute drug-induced paranoia superimposed on an ongoing or persistent brain dysfunction. Kowell likened the fragility of Ross's mental state to a house of cards which collapsed under Ross's state of acute drug intoxication.

## II.

### *Procedural Background*

In 1996, a jury found Ross guilty of the second degree murder of Emily (Pen. Code, § 187, subd. (a))[2] (count 1) and attempted voluntary manslaughter of Dion (§§ 664, 192, subd. (a)) (count 2).[3] The jury found true allegations that Ross personally used a firearm (§ 12022.5) in the commission of both offenses and that he inflicted great bodily injury in committing

---

[2] All further statutory references are to the Penal Code.

[3] The jury found Ross not guilty of first degree murder on count one and of attempted first degree murder on count 2, as well as on charged counts of residential burglary (§ 459) (count 3), forcible rape (§ 261, subd. (a)(2)) (counts 4 and 5).

count 2. After a bifurcated trial, the court found true allegations that Ross suffered a prior serious or violent felony conviction (§ 667, subds. (a), (b)–(i)) and served a prior prison term (§ 667.5, subd. (b)), based on a 1984 conviction for assault with a deadly weapon (§ 245, subd. (a)(1)).

The court imposed a sentence of 56 years to life: On count 1, 15 years to life for the murder, doubled to 30 years to life due to the prior strike, plus a consecutive five-year upper term for the section 12022.5 enhancement; and on count 2, the upper term of five years, six months, for the attempted voluntary manslaughter, doubled to 11 years due to the prior strike, plus a consecutive five years for the prior strike (§ 667, subd. (a)) and a consecutive five-year upper term for the section 12022.5 enhancement. The court stayed punishment for the prior prison term and great bodily injury enhancement.

Ross appealed and this court affirmed the convictions but struck the five-year prior strike enhancement (§ 667, subd. (a)) because it had not been properly pleaded in the amended information, and remanded the case for resentencing. (*People v. Ross, supra*, A076077).)

On remand, the trial court struck the five-year section 667, subdivision (a) enhancement and imposed the previously stayed one-year prison term enhancement (§ 667.5, subd. (b)), imposing an aggregate term of 52 years to life.

In 2021, the Legislature, in Senate Bill No. 483 (2021-2022 Reg. Sess.), enacted section 1170.1, subsequently renumbered 1172.75, which (with an exception inapplicable here) invalidated section 667.5, subdivision (b) prior prison enhancements imposed before 2020. (Stats. 2021, ch. 728, § 3, eff. Jan. 1, 2022; Stats. 2022, ch. 58, § 12, eff. June 30, 2022.) On September 12, 2022, Ross filed an in propria persona petition to recall sentence. The court appointed counsel, who on March 7, 2024, filed a motion

5

to strike Ross's section 667.5 enhancement and resentence him pursuant to sections 1172.75 and 1172.1.  The motion sought to have the prison enhancement stricken as required by section 1172.75, and to have Ross's sentence modified pursuant to the statute's directive to apply recently enacted ameliorative sentencing laws.  (§ 1172.75, subd. (d).)  The People agreed that section 1172.75 required the court to strike the one-year section 667.5, subdivision (b) enhancement and resentence Ross, but argued the court should not reduce the sentence by more than the required one year.

At the resentencing hearing on January 17, 2025, the court declined to reduce Ross's sentence beyond striking one year for the no longer valid prison enhancement.  This appeal followed.

## DISCUSSION

## I.

### *Governing Law*

Section 1172.75, subdivision (a) provides that "[a]ny sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of Section 667.5 . . . is legally invalid."[4]  When a judgment includes such an enhancement, "the court shall recall the sentence and resentence the defendant."  (§ 1172.75, subd. (c).)

Section 1172.75, subdivision (d)(1) directs that resentencing "shall result in a lesser sentence than the one originally imposed as a result of the elimination of the repealed enhancement, unless the court finds by clear and convincing evidence that imposing a lesser sentence would endanger public safety" and "shall not result in a longer sentence than the one originally

---

[4]  The statute excludes enhancements for prior convictions of a sexually violent offense, an exception inapplicable here.  (§ 1172.75, subd. (a).)

6

imposed." The statute requires the court to apply "changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing" (§ 1172.75, subd. (d)(2)) and provides that the court "may consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice." (*Id.,* subd. (d)(3).) "Unless the court originally imposed the upper term, the court may not impose a sentence exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subd. (d)(4).)

Section 1172.75 requires full resentencing for all defendants who qualify for recall of sentence under the statute. (*People v. Rogers* (2025) 108 Cal.App.5th 340, 361 (*Rogers*); *People v. Monroe* (2022) 85 Cal.App.5th 393, 402.) The court may "revisit all prior sentencing decisions" (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425) and " ' "has jurisdiction to modify *every* aspect of the sentence, and not just the portion subjected to the recall." ' " (*Rogers,* at p. 358.)

## II.

### *Additional Background*

In addition to striking the section 667.5, subdivision (b) enhancement, Ross's motion sought a "lower term of incarceration, ideally a determinate

7

term." Specifically, he urged the court to dismiss his prior strike conviction (*Romero*[5] motion), strike one of the two section 12022.5 enhancements pursuant to section 1385, and impose a middle term rather than the upper term on his attempted voluntary manslaughter conviction pursuant to section 1170, subdivision (b).

Acknowledging the harm he had caused, Ross argued that reduction of his sentence was warranted based on his mental state and life circumstances at the time he committed the offense, his rehabilitation efforts over almost 30 years in prison, and changes in California's sentencing laws.[6]

---

[5] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[6] Ross's motion was based on section 1172.1 as well as section 1172.75. The former authorizes trial courts to recall and resentence a defendant, in the interest of justice, by modifying the sentence or vacating the conviction, imposing judgment on a necessarily included or related lesser offense, then resentencing to a reduced term. (§ 1172.1, subd. (a)(3).)

Ross contends the record does not demonstrate whether the trial court based its decision on section 1172.5 alone or also ruled on his additional request for resentencing pursuant to section 1172.1. A defendant is not entitled to petition for relief under section 1172.1 and, if a defendant does so, the court is not required to respond. (§ 1172.1, subd. (c).) Therefore, since the court did not refer to section 1172.1, we presume it acted pursuant to section 1172.75.

In any event, Ross does not suggest he is entitled to any relief under section 1172.1 different from what he might obtain under section 1172.75. The only point he makes specific to section 1172.1 is that it *requires* a court, in recalling and resentencing, to consider postconviction factors (§ 1172.1, subd. (a)(5)), whereas a court resentencing pursuant to section 1172.75 "may" consider postconviction factors. (§ 1172.75, subd. (d)(3).) Independent of section 1172.1, however, section 1171 provides that in all proceedings "to modify a sentence or conviction pursuant to an ameliorative statute," among other things, the court "shall consider any pertinent circumstances that have arisen since the prior sentence was imposed." (§ 1171, subds. (a), (c)(2).) We need not consider section 1172.1 further.

Ross's motion emphasized ameliorative changes in the criminal justice system, particularly those recognizing increased scientific understanding of brain development, young adults' immature judgment and impulsivity, and the effects of trauma in further delaying emotional and psychological development. Although Ross was 28 years old at the time of his offenses, older than the 25-year maximum defining a youth offender (§ 3051), he urged that factors in his background made considerations related to youth relevant and, with respect to his strike conviction, that he was 18 at the time of the underlying offense.

Ross argued that at the time of the current offenses he was in an "acute, drug induced, paranoid state which was compounded by his underlying brain dysfunction including significant memory loss" and his "relatively young age, unstable mental state, chronic substance abuse and acute drug induced paranoid episode . . . made him highly susceptible to rash action from any degree of provocation." The motion discussed trial testimony from medical experts, friends, acquaintances and Ross himself concerning matters including his traumatic background, history of substance abuse and brain damage likely due to that abuse. He asserted that he did not begin to get mental health and substance abuse treatment until he was incarcerated, he felt extreme guilt and remorse for his crimes, and he had committed himself to rehabilitation. Lengthy exhibits to the motion documented Ross's history of trauma, chronic substance abuse, mental health issues, extensive rehabilitative and educational efforts and mostly positive disciplinary record.[7] A psychological assessment by neuropsychologist Amanda Gregory

_____

[7] These exhibits included a psychological assessment, social history report, documentation of rehabilitative programming, letters of support, records and reports regarding prison employment and counseling,

9

concluded his current risk for future violence is low, although it noted the risk would increase to moderate if Ross had a substance use relapse and did not seek immediate help.[8]

The People, in arguing Ross's sentence should not be reduced more than the one year required by section 1172.75, emphasized the egregious facts of Ross's current crimes. The People also urged that the defense mischaracterized Ross's 1984 prior conviction by describing it as " 'based on a fight' " when the police report described Ross hitting the victim several times with an iron bar, causing loss of consciousness and hospitalization. Contesting the defense assertion that Ross had been an "exceptional" inmate, the People argued his prison records showed both positive and negative conduct, the latter involving "numerous incidents of misconduct," including eight incidents resulting in permanent loss of " 'good time' " credits between 2000 and 2010; possession of heroin in 2011; a 2012 report of " 'unfavorable' " programming that resulted in an increased prison classification score; a positive methamphetamine test in 2017; and two write-ups in 2021, one for refusing to move cells and one for "inappropriate conduct" during a telephone call. The People also asserted that "by operation of law, specifically PC 3055

---

educational records, and Ross's letter of apology, statement of accountability, and reentry and relapse prevention plan.

[8] According to Gregory's report, Ross's prison records showed three rule violations in the last 10 years, all nonviolent; his last violation involving violence was a fight in 2010 and, before that, three incidents in 2000 and two incidents in 2001. Ross reported that he currently had the "lowest points and level possible for an inmate due to his good behavior after starting as a Level IV inmate." His most recent reported substance use was a "brief[] relaps[e]" in 2019, when he learned his teenage grandson had died of cancer. Previously, he had tested positive for methamphetamine in 2017 and had "substance related write ups" in 2007 and 2011.

and federal court order, he will receive a parole eligibility hearing in November of 2026."

The trial court began the resentencing hearing by stating that it had read all of the parties' papers. After brief remarks from counsel, the trial court explained its ruling:

"Well, I've done a number of these resentencing petitions, in various crimes and various lengthy long sentences for serious crimes. This one is different because, first of all, the facts in the underlying case, basically under the bed of one of the victims, comes out, commits a—what turns out to an attempted voluntary manslaughter on the mother while the child is there; child runs out; follows the child out and shoots her in the face, is such a heinous crime, an eight-year old— . . . [¶] And combined with the fact that although he has done some good things while incarcerated, he's also had write-ups. He's also had drugs. He's had a number of things that are troubling such that I would make the finding that he currently poses unreasonable risk of danger to public safety as defined in 1170.18. And I would not reduce the sentence beyond that which is mandated by law, which is to strike the one-year prison prior. [¶] So I'll reinstate his sentence of 187. He'll serve 15 to life, doubled by the strike. I'm also going to deny the Romero motion. I find that it falls squarely within the spirit of the three-strikes law. [¶] ·He'll serve an additional, it says, five years on the 12022.5, and then the 667(a), for essentially what's currently in this abstract, the 15 to life. I'm just subtracting the one year. . . . [¶] . . . [¶] Apparently he's eligible for parole next year anyway."

11

# III.

## *Analysis*

### A. Imposition of the Upper Term

Ross's original sentence included an upper term for the attempted voluntary manslaughter. At resentencing, aside from subtracting the one year required by section 1172.75 and declining to dismiss the prior strike, the trial court reimposed the existing aggregate sentence without articulating specific reasons for the terms on individual components. The court stated two reasons for its overall decision to maintain the original sentence—the heinous nature of Ross's crimes and his disciplinary record in prison. Ross contends the trial court erred in imposing the upper term on his attempted voluntary manslaughter conviction because there were no aggravating circumstances proven beyond a reasonable doubt by the jury or stipulated as required by current law (§ 1170, subd. (b).)

When Ross was sentenced in 1996 and resentenced in 1998, section 1170, subdivision (b) provided that when a statute specified three terms, there was a presumption in favor of the middle term and the aggravating or mitigating circumstances that would enable the court to impose a higher or lower term had to be found by the court by a preponderance of the evidence. (*People v. Lynch* (2024) 16 Cal.5th 730, 746 (*Lynch*).) Subsequently, *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*) held California's determinate sentencing law violated the defendant's Sixth Amendment right to a jury trial by giving the trial judge, rather than the jury, "authority to find the facts that expose a defendant to an elevated 'upper term' sentence." (*Cunningham,* at p. 274.) *Cunningham* suggested California could remedy the problem by having the jury "find any fact necessary to the imposition of an elevated sentence" or by "permit[ting]

judges genuinely 'to exercise broad discretion . . . within a statutory range.' " (*Id.* at p. 273.)  In response, the Legislature in 2007 followed the second of these approaches, amending section 1170, subdivision (b) to "eliminate the middle term presumption and instead give the trial court authority to select among any of the three terms as a matter of discretion and without any judicial factfinding." (*Lynch,* at pp. 747-748, 759.)

The Legislature changed course in 2022 with amendments that, in effect, adopted the first *Cunningham* option.  (*Lynch, supra,* 16 Cal.5th at p. 748.)  Under the current version of section 1170, subdivision (b), when a statute specifies three possible terms, the middle term is the presumptive sentence and trial courts may impose a sentence exceeding the middle term "only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt." (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)  The statute "safeguard[s] the Sixth Amendment jury trial guarantee" by requiring that " 'any fact that *exposes* a defendant to a greater *potential* sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.' " (*Lynch,* at p. 759, quoting *Cunningham, supra,* 549 U.S. at p. 281.)  Additionally, section 1170 now provides that if any of several enumerated circumstances was "a contributing factor in the commission of the offense," the court must impose a lower term sentence "unless the court finds that the aggravating circumstances outweigh the

13

mitigating circumstances that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).)[9]

As earlier indicated, section 1172.75, subdivision (d)(4), provides: "*Unless the court originally imposed the upper term*, the court may not impose a sentence exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Italics added.) The proper interpretation of this provision has caused disagreement among the Courts of Appeal, and the issue is presently pending before the California Supreme Court.[10]

*People v. Brannon-Thompson* (2024) 104 Cal.App.5th 455 (*Brannon-Thompson*) interpreted section 1172.75, subdivision (d)(4) to mean that where a defendant was originally sentenced to an upper term, the resentencing court may impose the upper term even if aggravating factors were not found true beyond a reasonable doubt. (*Brannon-Thompson,* at p. 458.) In that court's view, although section 1172.75, subdivision (d)(2) generally requires the resentencing court to apply ameliorative changes in the law at a section 1172.75 resentencing, section 1172.75, subdivision (d)(4) "carves out an exception to the general rule" and "does not require aggravating factors to be found true beyond a reasonable doubt if the upper term was previously imposed." (*Brannon-Thompson,* at p. 458; see *id.* at p. 467.) *Brannon-*

---

[9] These circumstances are that the defendant "experienced psychological, physical, or childhood trauma," was a youth at the time the offense was committed, or was a victim of intimate partner violence or human trafficking prior to or at the time of commission of the offense. (§ 1170, subd. (b)(6)(A)–(C).)

[10] *People v. Eaton* (Mar. 14, 2025, C096853) (nonpub. opn.), review granted May 14, 2025, S289903.

14

*Thompson* concluded that the "plain meaning" of the language in section 1172.75, subdivision (d)(4) makes it "evident the Legislature intended the new burden of proof amendments to section 1170, subdivision (b) apply only if the trial court is imposing the upper term for the first time at a section 1172.75 resentencing." (*Brannon-Thompson,* at pp. 466-467.)

Ross relies on *People v. Gonzalez* (2024) 107 Cal.App.5th 312 (*Gonzalez*), which disagreed with *Brannon-Thompson.  Gonzalez* acknowledged that "the plain language of section 1172.75, subdivision (d)(4), on its face, could be interpreted as not requiring proof of aggravating factors before reimposing an upper term sentence." (*Gonzalez,* at pp. 328-329.)  But the court found "another reasonable interpretation of section 1172.75, subdivision (d)(4) would simply *restrict the scope of defendants eligible to receive the upper term* at resentencing to those who previously received the upper term, instead of creating a condition or exception independently justifying the imposition of the upper term.  Under such an interpretation, a defendant would be eligible for the upper term but could not receive it in the absence of aggravating factors stipulated to by the defendant or proven beyond a reasonable doubt to the trier of fact." (*Id.* at p. 329.)

The *Gonzalez* court's analysis was motivated by constitutional considerations, which *Brannon-Thompson* did not address. (*Brannon-Thompson, supra,* 104 Cal.App.5th at p. 467.)  The *Gonzalez* court believed *Brannon-Thompson*'s interpretation "would potentially result in the statute impermissibly exempting defendants who previously received upper term sentences from the rule that eligibility for any upper term sentence depends on 'facts that have been established consistently with Sixth Amendment principles,' " and "allowing a court to resentence a defendant to an upper term sentence without proof beyond a reasonable doubt of aggravating

15

factors, would run afoul of the Sixth Amendment implications identified in *Lynch*." (*Gonzalez, supra,* 107 Cal.App.5th at p. 329.) Following the principle that "a statute should not be construed to violate the Constitution if any other construction is viable," *Gonzalez* held that "the statutory interpretation for section 1172.75, subdivision (d)(4), which simply *restricts the scope of defendants eligible to receive the upper term*, allows us to read the statute in a manner that is internally consistent and avoids running afoul of the Sixth Amendment. Under such an interpretation, a defendant would be eligible for the upper term but could not receive it in the absence of aggravating factors stipulated to by the defendant or proven beyond a reasonable doubt to the trier of fact." (*Id.* at p. 330.)

*People v. Mathis* (2025) 111 Cal.App.5th 359, review granted August 13, 2025, S291628 (*Mathis*), agreed with *Brannon-Thompson*'s conclusion and further concluded it did not implicate Sixth Amendment concerns. (*Mathis,* at pp. 373-374.) *Mathis* reasoned that when the defendant was originally sentenced to an upper term in 2017, the statutory scheme then "did not run afoul of the Sixth Amendment" because it authorized the imposition of upper term sentences without any additional factfinding. (*Id.* at p. 373.) Accordingly, it was not necessary for the Legislature to impose heightened factfinding requirements for resentencing such defendants, but "for defendants who did not receive an upper term in their original sentencing, to ensure that any newly imposed upper term sentence is consistent with the Sixth Amendment, the Legislature mandated that any such aggravating fact be found pursuant to the heightened factfinding requirements specified in *Cunningham*. (*See* § 1172.75, subd. (d)(4).)" (*Ibid.*)

16

*Mathis* further explained that although "we presume that the Legislature intends ameliorative changes in sentencing law to apply in all cases that are nonfinal, including cases which became nonfinal due to resentencing[] ([*s*]*ee People v. Padilla* (2022) 13 Cal.5th 152, 162-163) . . . the Legislature is also free to 'write statutes that provide for a different or more limited form of retroactivity, or for no retroactivity at all,' and it may 'disclaim the application of a new ameliorative law to proceedings that occur after a defendant's conviction or sentence has been vacated.' (*Id.*, at p. 162 [citations].) Section 1172.75, subdivision (d)(4), does exactly that. It expresses the Legislature's intent that the new, heightened factfinding requirements for aggravating factors do not apply where the defendant was originally, lawfully sentenced to an upper term." (*Mathis, supra,* 111 Cal.App.5th at p. 374.)

We agree with the *Brannon-Thompson* and *Mathis* courts that their interpretation of section 1172.75, subdivision (d)(4) is the natural reading of its language. The comma following the introductory phrase, "[u]nless the court originally imposed the upper term," signals that the phrase modifies the text that follows. The remainder of the sentence states the preconditions to imposition of an upper term sentence established by section 1170, subdivision (b). The structure of the sentence thus indicates that the introductory phrase creates an exception to the restriction that follows.

By contrast, the interpretation adopted by the *Gonzalez* court appears to us to render a substantial portion of section 1172.75, subdivision (d)(4) surplusage. If the introductory phrase was meant to limit eligibility for an upper term sentence to defendants who received the upper term when originally sentenced, as *Gonzalez* held, those defendants could not be resentenced to an upper term in *any* circumstances, and the phrase following

17

the second "unless"—"unless there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial"—would serve no purpose.  If the Legislature intended to prohibit imposition of upper term sentences for defendants who were not originally sentenced to upper terms, the provision could simply read, "Unless the court originally imposed the upper term, the court may not impose a sentence exceeding the middle term."  " ' "[C]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." ' "  (*People v. Franco* (2018) 6 Cal.5th 433, 437.)

Unlike the *Mathis* court, however, we are not able to say that the upper term originally imposed was lawful and "did not run afoul of the Sixth Amendment."  (*Mathis, supra,* 111 Cal.App.5th at p. 373.)  The defendant in *Mathis* was originally sentenced under a version of section 1170 that passed constitutional muster, as was the defendant in *Brannon-Thompson,* but Ross was originally sentenced under the version of section 1170 that was subsequently held unconstitutional.  (*Cunningham, supra,* 549 U.S. at pp. 274, 293; see *Lynch, supra,* 16 Cal.5th at p. 746.)  Allowing imposition of an upper term in the present case would present the situation *Gonzalez* discussed as a potential problem with the *Brannon-Thompson* interpretation—exempting a defendant "from the rule that eligibility for any upper term sentence depends on 'facts that have been established consistently with Sixth Amendment principles.'  (*People v. Black* (2007) 41 Cal.4th 799, 813.)"  (*Gonzalez, supra,* 107 Cal.App.5th at p. 329.)

*People v. Dozier* (2025) 116 Cal.App.5th 700 (*Dozier*) addressed the situation presented in our case and concluded that section 1170's new

18

factfinding requirements did not apply. (*Dozier*, at p. 706.) We agree with *Dozier* that reimposition of the previously imposed upper term did not violate the Sixth Amendment even though Ross, like Dozier, was originally sentenced under the pre-*Cunningham* version of section 1170. (See *Dozier*, at p. 714.) As we understand the language of section 1172.75, subdivision (d)(4), the Legislature intended the heightened factfinding requirement for imposition of an upper term on resentencing to apply to defendants who were originally sentenced to middle or lower terms but not to defendants who initially received the upper term. The Legislature did not distinguish between defendants sentenced under the original version of section 1170 subsequently declared unconstitutional and those sentenced under the 2007 version of section 1170 that complied with *Cunningham*'s requirements. "[T]he Legislature 'is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted.' " (*People v. Frahs* (2020) 9 Cal.5th 618, 634.) We presume, therefore, that the Legislature was aware of the previous versions of section 1170, the *Cunningham* decision, and the fact that some of the defendants entitled to relief under section 1172.75 would have been sentenced under the original sentencing law. (*Dozier,* at p. 715.)

As explained in *Dozier, supra,* 116 Cal.App.5th at pages 715-716, because Ross's sentence was final before *Cunningham* was decided and the 2007 and 2022 amendments to section 1170 enacted, none of these developments applied retroactively to his case. (See *In re Gomez* (2009) 45 Cal.4th 650, 660 [*Cunningham,* as application of *Blakely v. Washington* (2004) 542 U.S. 296, applies retroactively to cases not yet final when *Blakely* decided]; *People v. Amons* (2005) 125 Cal.App.4th 855, 868 [*Blakely* applies retroactively only to cases not yet final when *Blakely* decided]; *Lynch, supra,*

19

16 Cal.5th at p. 742 [2022 amendment to § 1170, subd. (b) applies retroactively to judgments not yet final on effective date of statute].) The Legislature's choice to require heightened fact finding on resentencing under section 1172.75 only for defendants originally sentenced to lower or middle terms thus left Ross in the same position he was in prior to resentencing: He was unable to take advantage of these changes in sentencing law because the judgment in his case was final. Absent constitutional impediment, the Legislature was free to make the choice reflected in section 1172.75, subdivision (d). (See *People v. Standish* (2006) 38 Cal.4th 858, 880 [" 'absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function' "].) As *Mathis, supra,* 111 Cal.App.5th at page 374, explained, while Ross's judgment became nonfinal when his sentence was vacated pursuant to section 1172.75, the Legislature was free to " 'disclaim the application' " of the ameliorative, heightened fact finding requirements in this situation. Ameliorative criminal laws are presumed to apply to all nonfinal cases "absent a discernable intent to the contrary." (*People v. Padilla, supra,* 13 Cal.5th at p. 162.) The language of section 1172.75, subdivision (d)(4) evinces a discernable intent not to extend the new heightened factfinding requirement to defendants previously sentenced to an upper term. (*Mathis,* at p. 374.)

We conclude the trial court was not precluded from imposing the upper term without aggravating circumstances stipulated to by Ross or found true beyond a reasonable doubt by the jury.

### B. The Trial Court Erred in Imposing Five-Year Terms on the Section 12022.5 Enhancements.

Ross's original sentence included a five-year term for each of the two section 12022.5 enhancements. The resentencing court did not change this component of the sentence. Ross contends this resulted in an unauthorized

sentence because five years is no longer one of the three terms specified in section 12022.5. When Ross committed his offenses in 1994, section 12022.5 provided for terms of three, four or five years (see Stats. 1989, ch. 1167, § 5; *People v. Joachim* (1995) 38 Cal.App.4th 1526, 1528, fn. 2), but the statute currently provides for terms of 3, 4 or 10 years. (§ 12022.5, subd. (a).)

Ross argues the resentencing court was limited to imposing a sentence of no more than the current four-year midterm because the court did not identify any aggravating factors to justify imposing a sentence exceeding the middle term. Enhancements punishable by one of three terms are subject to the requirement that a sentence in excess of the middle term may be imposed only when there are aggravating circumstances proven beyond a reasonable doubt or stipulated to by the defendant. (§ 1170.1, subd. (d)(1) & (2).) Additionally, Ross argues the court could not impose the current 10-year upper term because doing so would violate section 1172.75, subdivision (d)(1), which provides the court may not impose a sentence longer than the original one.

The People maintain the trial court did not err. Relying on principles applicable to the prohibition against ex post facto laws (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9), the People argue that because the upper term for violation of section 12022.5 was increased subsequent to Ross's offense, the trial court was required to impose the five-year term specified by the law existing at the time the offense was committed. "A statute violates the prohibition against ex post facto laws if it punishes as a crime an act that was innocent when done or increases the punishment for a crime after it is committed." (*People v. White* (2017) 2 Cal.5th 349, 360.) Thus, when the law changes after the commission of an offense so as to result in a more severe penalty, the court must apply the law that existed prior to the change. (See,

21

e.g., *People v. Trujeque* (2015) 61 Cal.4th 227, 256-257 [where statutory amendment subsequent to offense allowed refiling of charges that would have been precluded under prior law, prior law applied]; *People v. King* (1993) 5 Cal.4th 59, 79-80 [overruling of *In re Culbreth* (1976) 17 Cal.3d 330, which had limited imposition of § 12022.5 enhancements on multiple counts, could not be applied to defendant whose offense was committed before *Culbreth* was overruled].)

The People's argument rests on an implicit assumption that the court would again impose the upper term on the section 12022.5 enhancements and therefore had to contend with the ex post facto prohibition against imposing the 10-year term. But the court was not *required* to reimpose upper terms. As we have said, section 1172.75 requires full resentencing. (*Rogers, supra,* 108 Cal.App.5th at p. 361.) "[T]he mandatory directive in section 1172.75, subdivision (d)(2) to 'apply the sentencing rules of the Judicial Council' suggests the resentencing is to be performed under current rules." (*Id.* at p. 360.) Section 1172.75, subdivision (d)(3) of the statute "promotes an examination of information and circumstances that did not exist at the time of the original sentencing which, in turn, evinces an intent that the resentencing court must sentence anew under present circumstances." (*Rogers,* at p. 361.) Section 1172.75, subdivision (d)(4), which " 'guides the trial court in selecting among the lower, middle, and upper term on each count[]' [[c]itations] . . . demonstrates a legislative intent that the resentencing court will make new sentencing decisions on each count of conviction under certain limitations." (*Rogers,* at p. 361.) In short, the court was free to alter any part of the sentence as long as the sentence it imposed did not exceed the original sentence. This necessarily included the option of imposing a sentence of less than the upper term on the section 12022.5

enhancements, which would have eliminated the ex post facto problem the People rely on.

Contrary to the People's position, we do not believe it is reasonable to infer that the trial court specifically considered what sentence to impose on the section 12022.5 enhancements and chose a course necessitated by ex post facto concerns. As far as we are aware, neither the length of the terms to be imposed on the enhancements nor the potential ex post facto issues were raised in the trial court. As earlier noted, the court did not explain its reasons for the terms it imposed on individual components of Ross's sentence; rather, it discussed the sentence as a whole and concluded it would not reduce the sentence other than by striking the one-year prison prior. With respect to the section 12022.5 enhancements in particular, the court's remarks indicate it simply followed the original abstract of judgment: After saying it would "reinstate" the sentence on the murder conviction and denying Ross's *Romero* motion, the court continued, "He'll serve an additional, *it says*, five years on the 12022.5, and then the 667(a), for *essentially what's currently in this abstract*, the 15 to life. I'm just subtracting the one year."[11] (Italics added.)

---

[11] Although not directly related to the present issue, these remarks indicate the court was confused as to at least one component of Ross's existing sentence. The court's reference to the section 667, subdivision (a) prior strike enhancement suggests the court mistakenly believed it was reimposing the five-year sentence that had been imposed as part of Ross's original sentence, but that enhancement had been stricken by this court in our 1998 opinion. This apparent confusion lends some support to Ross's contention that the court, in general, did not fully understand the existing sentence or the specific sentence components the court was reimposing. But any error in the court's understanding regarding the section 667, subdivision (a) enhancement could not have affected the sentence the court imposed at the current resentencing hearing: The court modified the existing

23

In the ex post facto cases the People rely on, applying current law necessarily would have subjected the defendant to increased punishment (e.g., *People v. King, supra,* 5 Cal.4th at pp. 79-80 [imposing enhancements that could not have been imposed at the time of the offense]; *People v. Trujeque, supra,* 61 Cal.4th at pp. 256-257 [permitting prosecution of a case that could not have been refiled under prior law]), thus requiring application of prior law to avoid violating the ex post facto prohibition. In the present case, the court could apply current law without any ex post facto consequence by exercising its discretion to impose something less than the upper term. The People offer no authority suggesting that, in these circumstances, the court was required to impose a sentence unauthorized under current law or could lawfully do so.

We agree with Ross that the court was limited to imposing no more than the four-year middle term for each of the enhancements.

**C. Dangerousness**

In declining to reduce Ross's sentence by more than the one year for the section 667.5 prior prison term, the trial court stated that it found Ross "currently poses unreasonable risk of danger to public safety as defined in 1170.18." The court gave two reasons for this finding: First, the crime was particularly heinous, and second, while Ross had "done some good things while incarcerated, he's also had write-ups. He's also had drugs. He's had a number of things that are troubling . . . ." Ross contends the record does not support the court's finding.

---

sentence only by subtracting the one-year prison enhancement, and the existing sentence did not include any term for the section 667, subdivision (a) enhancement, which had been eliminated on remand following the prior appeal.

24

Section 1170.18, defines "unreasonable risk of danger to public safety" as "an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).) The offenses specified in section 667, subdivision (e)(2)(C)(iv) are "any homicide offense (including any attempted homicide offense), solicitation to commit murder, assault with a machine gun on a peace officer or firefighter, possession of a weapon of mass destruction, any serious or violent felony punishable by life imprisonment or death, and certain sex offenses." (*People v. Williams* (2021) 63 Cal.App.5th 990, 1001.)

It bears noting that the court was not required to make a finding on dangerousness as defined in section 1170.18. Section 1172.75 does not refer specifically to section 1170.18, and section 1172.75 requires a finding of danger to public safety only if the court is *not* imposing a lesser sentence than the one originally imposed. (§ 1172.75, subd. (d)(1).) That is not the case here, as the court did reduce Ross's sentence by one year. Regardless, the court's finding was the stated basis for the sentence the court imposed. A finding of danger to public safety is also relevant to Ross's request that the court strike enhancements pursuant to section 1385, although section 1385 employs a somewhat different definition of dangerousness.

As with risk determinations under other ameliorative sentencing legislation, we review the court's finding for abuse of discretion. (*People v. Garcia* (2024) 101 Cal.App.5th 848, 856.) " ' "[W]e ask whether the trial court's findings of fact are supported by substantial evidence, whether its rulings of law are correct, and whether its application of the law to the facts was neither arbitrary nor capricious." ' [Citations.] Ultimately, the superior

court's risk finding will be upheld 'if it falls within "the bounds of reason, all of the circumstances being considered." ' " (*Id.* at p. 857.) "Of course, if there is no evidence in the record to support the decision, the decision constitutes an abuse of discretion. (See *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066 . . . .)" (*People v. Buford* (2016) 4 Cal.App.5th 886, 895.)

Ross challenges the court's reliance on his prison write-ups, drug use and undefined "troubling" things as substantial evidence for finding he currently poses a danger to public safety. As earlier described, the People argued Ross's prison records showed "numerous incidents of misconduct," including eight resulting in permanent loss of " 'good time' " credits between 2000 and 2010; possession of heroin in 2011; " 'unfavorable' " programming in 2012 that resulted in an increased prison classification score; a positive methamphetamine test in 2017; and two write-ups in 2021, one for refusing to move cells and one for "inappropriate conduct" during a telephone call. But the People did not submit evidence documenting their representations. Ross argues that the "vague and unsupported" descriptions of his behavior in prison do not constitute substantial evidence of current dangerousness. He points out that the People did not make any showing as to what conduct led to the cited incidents resulting in loss of good time credits and whether it involved violence, and that in any case the most recent of the incidents was 15 years before the resentencing hearing. He maintains current dangerousness cannot be inferred from his possession of heroin 14 years before the resentencing hearing or being under the influence of methamphetamine 8 years before resentencing, and the report of "unfavorable" programming 13 years before resentencing, with no indication of what conduct was involved, has no evidentiary value. His write ups in

26

2021—for refusing to move cells and engaging in inappropriate conduct during a phone call—were not for violent conduct.

In contrast to the conduct cited by the People, Ross submitted considerable evidence of rehabilitation and positive performance in prison. This included certificates and other documentation of rehabilitative programming, employment and counseling, awards, letters of support, a letter of apology for his offenses and reentry and relapse prevention plans (some 216 pages in the clerk's transcript). Dr. Gregory's report described substantial positive changes in Ross's conduct, mental state and attitude, and concluded he poses a low risk of danger, and the social history report described the "rehabilitation and transformation" observed by program staff and family members.[12]

---

[12] Dr. Gregory's report concluded that Ross "no longer exhibits the antisocial personality characteristics that were apparent when he was a younger man. Specifically, he had no recent history of violence, he no longer exhibits significant anger issues, he has long turned his back on any gang affiliation, he is responsible in his work and education duties, he exhibits the capacity for empathy, he expresses what appears to be sincere remorse for his behavior, and he enjoys helping others as evidenced by his role as a teacher's aide. He has participated in extensive rehabilitation programming and has furthered his education." Gregory noted that Ross's average IQ score was significantly improved over his testing in 1995 and his scores on measures of academic skills and executive functions were also better, improvements that were likely secondary to his more stable current mental state and additional education gained during his incarceration.

The social history report described Ross's rehabilitation as apparent in his "extensive programming history" and minimal disciplinary history since 2011. This report noted that Ross's "rehabilitation and transformation" had been "noticeable to those whom he interacts with on a daily basis," that he was "[n]o longer the hardened gang member he once was," spent "a majority of his time and energy focusing on his education," and was described in terms such as "affable" and "enthusiastic."

27

Ross rightly emphasizes that the record does not show any recent violent conduct, the latest being 15 years prior to resentencing, and it is clear he has been diligent and successful in his progress toward rehabilitation. Still, his history of participation in prison violence was not irrelevant, especially combined with his previous criminal history and, in particular, the horrendous nature of the murder and attempted manslaughter. His record reflects tremendous progress in overcoming substance abuse issues but also occasional relapses. The most recent relapse (2019), however understandable as a response to intense grief over his grandson's death, reflects the continuing potential for future relapses. The trial court's concern about substance use is not unreasonable in light of the role it played in the present offenses.

At the same time, the People's reliance on undocumented representations concerning Ross's record is troubling, as is the minimization of Ross's largely positive institutional record by both the People and the court. Even if that record is not sufficient to compel a conclusion that Ross no longer presents a risk of danger to public safety, to say that he did "some" good things in prison is surely an understatement. We presume the court will thoroughly consider all relevant factors upon resentencing.

**D. *Romero* Motion**

Ross argues the trial court did not meaningfully consider his request to strike his 1984 strike conviction for assault with a deadly weapon. He maintains that because the court only made the conclusory statement that "it falls squarely within the spirit of the three strikes law," we cannot determine whether the court relied on improper factors or failed to take relevant factors into account. As to the former, Ross argues the People failed to provide any evidentiary support for its assertions that his prior conviction involved

28

hitting the victim several times with an iron bar, causing loss of consciousness and hospitalization, and that his parole violations were "not with minor things." Pointing out that the presentence report for his original sentencing provides no description of the facts underlying the prior conviction or his two parole violations, Ross suggests the court's ruling could have been based on the People's unsupported assertions or on what Ross sees as the court's "wrongful" finding that Ross is currently dangerous.

Ross also argues the record gives no indication the court considered his drug addiction at the time of his prior and current offenses, his rehabilitation efforts, or his background, character and prospects. His motion addressed these matters at great length, with detailed discussion of developments in understanding of brain development and the effects of early life stress and childhood trauma on behavior and decisionmaking, as well as his utilization of resources to facilitate his rehabilitation over the almost 30 years of incarceration since his conviction.

" '[W]hen facing a motion to dismiss a strike allegation, the trial court "must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of [the defendant's] background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." ' " (*Rogers, supra,* 108 Cal.App.5th at p. 358, quoting *People v. Vargas* (2014) 59 Cal.4th 635, 641.)

Ross does not contend the court abused its discretion in declining to strike the prior, only that the record does not demonstrate the court gave the issue meaningful consideration. The absence of stated reasons for the court's

denial does not provide a basis for inferring the court did not undertake the necessary analysis. " 'The trial court is not required to state reasons for declining to exercise its discretion to strike a strike. We presume the trial court has considered all relevant factors in the absence of an affirmative record to the contrary. When the record is silent as to the trial court's reasons for declining to strike a prior strike, we presume the court correctly applied the law. Only in an extraordinary case—where the relevant factors manifestly support the striking of a prior conviction and no reasonable minds could differ—would the failure to strike be an abuse of discretion.' " (*People v. Campbell* (2023) 98 Cal.App.5th 350, 383, quoting *People v. Edwards* (2022) 76 Cal.App.5th 523, 529; see *People v. Brugman* (2021) 62 Cal.App.5th 608, 637.)[13]

Nevertheless, as this case must be remanded due to the unauthorized sentences on the section 12022.5 enhancements, Ross will have another opportunity to seek dismissal of his prior strike conviction. We trust that in

---

[13] This issue differs from the issue of unauthorized upper term sentences on the section 12022.5 enhancements discussed in section III.B., *ante*, where we disagreed with the People's argument that we could infer or presume the court considered factors it did not expressly discuss on the record. Unlike a decision not to strike a prior strike (or, as will be discussed in the next section, an enhancement), for which a statement of reasons is not required, a statement of reasons generally *is* required for the choice of term on an offense or enhancement. (Cal. Rules of Court, rule 4.406(b)(3).) Moreover, it is one thing to presume proper consideration of relevant factors bearing on a discretionary choice between two authorized alternatives (striking or not striking enhancements) but quite another to apply that presumption where one of the alternatives is *not* authorized and the record indicates the court did not independently consider the prior court's choice of term.

30

acting on any such request, the trial court will consider all relevant circumstances, without reliance on unsupported factual assertions.

**E. Application of Section 1385 to the Gun Enhancements**

Ross argues that the record does not show the court considered the current version of section 1385 with respect to the section 12022.5 enhancements. As amended effective January 1, 2022, section 1385, subdivision (c)(1) requires the court to dismiss an enhancement "if it is in the furtherance of justice to do so," and subdivision (c)(2) "specif[ies] mitigating circumstances that the trial court should consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 16.) Section 1385, subdivision (c)(2) provides, "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

Ross contends two of the enumerated mitigating circumstances apply here: "Multiple enhancements are alleged in a single case," in which instance, "all enhancements beyond a single enhancement shall be dismissed" (§ 1385, subd. (c)(2)(B)); and "[t]he current offense is connected to . . . childhood trauma." (*Id.,* subd. (c)(2)(E).) He asserts that subdivision (c)(2)(B) *required* the court to dismiss one of the enhancements unless doing so would endanger public safety and, as earlier discussed, that the evidence does not

31

support the court's finding that he posed a current risk of danger to public safety.

Ordinarily, the fact that the court did not discuss the possibility of dismissing one of the section 12022.5 enhancements pursuant to section 1385 would not provide a basis for us to conclude it failed to consider the issue. Section 1385 requires a court to state reasons for dismissing an enhancement (§ 1385, subd. (a)) but does not require such a statement when the court declines to dismiss. (*People v. Bravo* (2025) 107 Cal.App.5th 1144, 1157.) Rather, the court " 'is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary.' " (*People v. Brugman, supra,* 62 Cal.App.5th at p. 637.) " '[A]bsent evidence to the contrary, we presume that the trial court knew the law and followed it.' (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)" (*Bravo,* at p. 1157.)

Ross's briefs specifically asked the court to dismiss or stay one of the two section 12022.5 enhancements pursuant to the directive of section 1385 to give great weight to the mitigating circumstances that his sentence included multiple enhancements and that he suffered from mental health issues, the effects of childhood trauma and drug addiction at the time of his offenses. (§ 1385, subd. (c)(2)(B), (D) & (E).) The trial court stated that it had read the parties' briefs, and we presume it considered the facts and arguments presented. Since the court found Ross posed an unreasonable risk of danger to public safety, it would have believed section 1385 did not require it to dismiss either of the enhancements or weigh the existence of any

32

mitigating circumstances greatly in favor of dismissal. (§ 1385, subd. (c)(2).)[14]

The record gives us some concern about relying on the usual presumptions to conclude the court considered whether to dismiss one of the section 12022.5 enhancements pursuant to section 1385. If, as the court's remarks indicate, it simply decided not to modify the existing aggregate sentence (apart from striking the prison prior), it is not reasonable to assume the court specifically considered the factors section 1385 specifies as bearing on whether to dismiss enhancements. As with other issues we have discussed, since resentencing is required for other reasons, the court will be able to correct any oversights in its application of section 1385 on remand.

**F. Evidence of Rehabilitation**

Ross next argues the record does not reflect that the trial court considered his disciplinary record, rehabilitative achievements or other circumstances indicating continued incarceration was not in the interest of justice. As we have described, Ross documented engagement in extensive rehabilitative programming during the course of his incarceration and minimal disciplinary violations in recent years. Dr. Gregory found he posed a low risk for future violence and reported that he no longer exhibited significant anger issues, had disassociated from gang affiliation, was responsible in employment and education, demonstrated capacity for empathy, expressed sincere remorse for his behavior and enjoyed helping

---

[14] Ross's view that section 1385, subdivision (c)(2)(B) *required* the court to dismiss one of the enhancements unless doing so would endanger public safety is incorrect. The court retains discretion not to dismiss an enhancement even without a finding of dangerousness if it finds dismissal would not be in furtherance of the interests of justice. (*People v. Mazur* (2023) 97 Cal.App.5th 438, 445.)

others.  The social history report related very positive observations of Ross's conduct and attitude during his incarceration.

The trial court's explanation of its ruling, although brief, expressly referenced Ross having done "some good things" in prison as well as his "write-ups" and drug use.  Ross obviously believes the court should have given more weight to the former and less to the latter, but this does not mean the court failed to consider these circumstances.  In any event, we are confident it will fully consider them on remand.[15]

## DISPOSITION

The sentence is vacated and the matter is remanded to the trial court for resentencing.  Any sentence imposed on the section 12022.5 enhancements shall be in accordance with the terms specified under current law.  The court shall consider its sentencing choices consistent with the views expressed in this opinion.

---

[15] Ross suggests the court's decision not to further reduce his sentence may have been influenced by the prosecutor's erroneous representation that he would be eligible for elderly parole consideration in 2026.  As he points out, the elderly parole program does not apply to individuals sentenced pursuant to section 1170.12 or section 667, subdivisions (b) to (i), as Ross was.  (§ 3055, subd. (g).)  Any mistake in this regard, however, does not appear to have influenced the trial court's decision:  the court simply observed, after making its ruling, "Apparently he's eligible for parole next year anyway."  Also, Ross does not refer to or explain the apparent contradiction between his claim of misrepresentation regarding an upcoming parole hearing and the statement in Dr. Gregory's report that Ross told her he has a parole hearing in 2026 and has been preliminarily accepted for placement at a halfway house.  The relevance of any upcoming parole hearing is another matter that can be clarified on remand.

STEWART, P. J.

We concur.

MILLER, J.

DESAUTELS, J.

*People v. Ross* (A172545)